UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | Case No. 3:22-CR-00071 RLM |
| | ) | |
| JEFFREY SREDL | ) | |

## UNITED STATES' RESPONSE TO DEFENDANT'S MOTION TO DISMISS THE INDICTMENT

Comes now the United States of America, by its counsel, Clifford D. Johnson, United States Attorney for the Northern District of Indiana, through Jerome W. McKeever, Assistant United States Attorney, and responds to Defendant's motion to dismiss the indictment. DE 36.

### A. Offense conduct and relevant procedural history

On June 7, 2022, officers responded to a shooting in Logansport and found a woman suffering from a non-life threatening gunshot wound to her shoulder. She told officers that she accidentally shot herself with a .22 caliber home-made gun belonging to Defendant. She described the firearm and indicated that it looked identical on both ends, making it difficult for her to know which end was the barrel. She said that the gun fired when she was holding it and either she or Defendant bumped it. She reported that Defendant had more home-made guns in his van. On June 10, 2022, investigators executed a search warrant and

found 3 homemade slam-fire guns in Defendant's van. Defendant later admitted

that he made those 3 slam-fire guns, which are depicted here:







On September 23, 2022, investigators executed a search warrant at

Defendant's home in Monticello and found another slam-fire gun as well as

firearms, ammunition, and parts to assemble other slam-fire guns. None of the

"firearms" recovered from Defendant's van or his home were registered to him in the National Firearms Registration and Transfer Record.

An ATF firearms enforcement officer examined the three slam-fire guns recovered from Defendant's van and determined that the first gun depicted above met the definition of "any other weapon" under 26 U.S.C. § 5845(e), thus making it a "firearm" under 26 U.S.C. § 5845(a)(5), because it could be concealed on a person, discharge a shot through the energy of an explosive, and did not fall under any exceptions such as being a pistol or revolver having a rifled bore. 26 U.S.C. § 5845(e). The two other slam-fire guns in the van met the definition of "destructive devices" under 26 U.S.C. § 5845(f)(2), thus making them "firearms" under 26 U.S.C. § 5845(a)(8), because they could expel projectiles by the action of an explosive, had barrels that were more than one-half inch in diameter, and were not suitable for sporting purposes. The slam-fire gun recovered from Defendant's home is also a "destructive device" and "firearm" under the National Firearms Act definitions.

A grand jury indicted Defendant in October of 2022 with two counts of possessing unregistered firearms in violation of 26 U.S.C. § 5861(d). DE 13. On February 10, 2023, Defendant filed a motion to dismiss the indictment claiming the National Firearms Act statutes of 26 U.S.C. §§ 5841, 5861(d), and 5871 are unconstitutional in light of *New York State Rifle & Pistol Ass'n v. Bruen*, 142 S. Ct. 2111 (2022).

**B. Argument**

Defendant argues that the National Firearms Act statutes at issue are unconstitutional facially and as-applied, and therefore the Court should dismiss the indictment. DE 36. The Court should resolve as-applied challenges before facial challenges. *Washington State Grange* v. *Washington State Republican Party*, 552 U.S. 442, 450 (2008). If the statute is constitutional as applied to the Defendant, any facial challenge should fail as the statute will not be unconstitutional in all applications. *United States* v. *Salerno*, 481 U.S. 739, 745 (1987); *see also City of L.A. v. Patel*, 576 U.S. 409, 415, 418 (2015).

1.    **The National Firearms Act remains constitutional after** ***Bruen***

The National Firearms Act (NFA) is codified at 26 U.S.C. §§ 5801-5872. The criminal offense with which Defendant is charged, 26 U.S.C. 5861(d), provides that it is unlawful for a person "to receive or possess a firearm which is not registered to him in the National Firearms Registration and Transfer Record." 26 U.S.C. § 5861(d). The Indictment also cites § 5841, pertaining to firearm registration, and § 5871, pertaining to penalties. DE 13. Defendant argues that the statutes with which he is charged place prohibitions on firearm possession and thus violate the Second Amendment. DE 36 at 10.

The Second Amendment provides that "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and

bear Arms, shall not be infringed." U.S. Const. amend. II. Fifteen years ago, the Supreme Court concluded that the Second Amendment confers an "individual right to possess and carry weapons in case of confrontation." *District of Columbia v. Heller*, 554 U.S. 570, 592 (2008). The "central" aspect of this right is the "right to self-defense." *Id.* at 628. The Court noted, however, that "the right secured by the Second Amendment is not unlimited." *Id.* at 626; *see also Bruen*, 142 S. Ct. at 2128 (quoting *Heller*). The arms protected under the Second Amendment include those "in common use at the time" of the militia and exclude "dangerous and unusual weapons." *Id.* at 627. Certain types of weapons are not covered by the Second Amendment due to their nature. *Heller*, 554 U.S. at 622, citing *United States v. Miller*, 307 U.S. 174, 178 (1939) (finding a short-barreled shotgun not to be "part of the ordinary military equipment" and not to have a use that could "contribute to the common defense").

Moreover, the *Heller* Court stated that "nothing in our opinion should be taken to cast doubt on longstanding prohibitions on … laws imposing conditions and qualifications on the commercial sale of arms." *Heller*, 554 U.S. at 626-27; *see also McDonald v. City of Chicago, Ill.*, 561 U.S. 742, 786 (2010) (quoting the same). In fact, according to the Court, such restrictions are "presumptively lawful regulatory measures," and this list is not exhaustive. *Heller*, 554 U.S. at 627 n.26.

The Court recently elaborated on the framework of Second Amendment analysis in *Bruen*. There, the Court analyzed the constitutionality of a New York firearm licensing scheme where an applicant was required to prove that he had "proper cause" to carry a handgun in public for self-defense. *Bruen*, 142 S. Ct. at 2123. The Court struck down the "proper cause" requirement as too subjective and violative of the Second Amendment. *Id.* at 2156.

In reaching this conclusion, the Court laid out the analytical framework for determining whether a firearm regulation is constitutional under the Second Amendment. Courts "assess whether modern firearms regulations are consistent with the Second Amendment's text and historical understanding." *Id.* at 2131. To make this assessment, a court must engage in a two-prong analysis. First, the court must determine whether "the Second Amendment's plain text covers an individual's conduct." *Id.* at 2126. If it does not, the analysis ends, and the Government's regulation is valid.

If the conduct at issue is covered by the Amendment's text, however, the Government must "demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation." *Id.* Only if a firearm regulation is consistent with this Nation's historical traditional may a court conclude that the individual's conduct falls outside the Second Amendment's protections. *Id.* In conducting this historical analysis, the Court recognized that the government need not present a one-to-one comparison between regulations

6

in existence during Colonial times and those at issue in the present litigation. *Id.* at 2132. Rather, the government may demonstrate historical acceptance of a regulation by "analogy" to a similar regulation that existed in the Founding Era. *Id.* In this way, the test in *Bruen* only requires a showing of a historical example that is "relevantly similar" to the current regulation; the government only has to provide evidence of a "representative historical *analogue*, not a historical *twin*." *Id.* at 2132-33 (quotation omitted, emphasis in original). The Court looked at historical precedent before, during, and after the founding. *Id.* at 2131-32.

The Supreme Court further noted that its analysis of New York's discretionary licensing regime did not undermine the constitutionality of 43 states' "shall issue" licensing systems that required no showing of need by the applicants. *Id.* at 2138 n.9. Even though those states had various "narrow, objective, and definite" criteria the applicants had to meet before being given a license to possess a firearm, those criteria were constitutionally permissible because they were "designed to ensure only that those bearing arms in the jurisdiction are, in fact, 'law-abiding, responsible citizens.'" *Id.; see also Bruen*, 142 S. Ct. at 2161-62 (Kavanaugh, J., concurring) (noting those statutes were "constitutionally permissible" even though they required a "license applicant to undergo fingerprinting, a background check, a mental health records check, and training in firearms handling and in laws regarding the use of force,

among others"). Those statutes could be unconstitutionally applied to an individual applicant and "deny ordinary citizens their right to public carry" if the objective criteria were "put toward abusive ends" and, for example, resulted in "lengthy wait times in processing license applications or exorbitant fees." *Id.* at 2138 n.9. Absent that, however, licensing laws with those minimal objective criteria were constitutional because they did not "necessarily prevent 'law-abiding, responsible citizens' from exercising their Second Amendment right to public carry." *Id.*

    **2.**     **The Second Amendment's plain text does not reach the Defendant's conduct**

Defendant's argument fails at the first step of the *Bruen* analysis because the text of the Second Amendment does not cover his conduct or the statute with which he is charged. This is because: (a) the registration requirement that defendant violated does nothing to "infringe[ ]" on the right to bear arms; and (b) the carrying of this particular type of firearm is not protected. First, the Second Amendment only proscribes laws that "infringe[ ]" on the protected right to "keep and bear Arms." Nothing in the NFA infringes that right. *See, e.g.,* Webster's 1828 American Dictionary of the English Language (defining "infringe" as "[t]o break; to violate; to transgress" and "[t]o destroy or hinder"). Rather, the NFA is a statute that does not prohibit the possession of firearms but instead "imposes strict registration requirements of statutorily defined

'firearms.'" *Staples v. United States*, 511 U.S. 600, 602 (1994). Accordingly, one could be charged both with possession of a "firearm" and separately charged for failing to register that same "firearm" under the NFA because the latter punishes a "registration requirement." *United States v. Carmel*, 548 F.3d 571, 577-79 & n.2 (7th Cir. 2008).

Because the NFA is part of the regulatory scheme regarding the sales and ownership of firearms, it falls outside the scope of the Second Amendment. Indeed, the Supreme Court signaled that its recent Second Amendment decisions do not implicate the "presumptively lawful" category of "laws imposing conditions and qualifications on the commercial sales of arms." *Heller*, 554 U.S. at 626-627 & n.26 (observing that "laws imposing conditions and qualifications on the commercial sales of arms" are presumptively lawful regulatory measures"); *cf. Bruen*, 142 S. Ct at 2138 n.9 ("[N]othing in our analysis should be interpreted to suggest the unconstitutionality of the 43 States 'shall issue' licensing regimes, *** which often required applicants to undergo a background check or pass a firearms safety course."); *id.* at 2157 (Alito, J., concurring) (explaining that *Bruen* does not "disturb[]" Heller's statements "about restrictions that may be imposed on the possession or carrying guns"); *id.* at 2162 (Kavanaugh, J., concurring) (finding that "shall-issue licensing regimes are constitutionally permissible" and may require a license applicant to undergo fingerprinting, a background check, a mental health records check, and training

9

in firearms handling"). *See Huddleston v. United States,* 415 U.S. 814, 824-25 (1974) (regulatory scheme "was enacted as a means of providing adequate and truthful information about firearms transactions"); *see also Abramski,* 573 U.S. at 188 (similar regulatory scheme to ensure the "lawfulness of a gun sale" and that the dealer has sufficient information to check the "true purchaser's identity and eligibility for gun ownership").

The NFA's "requirements that firearms dealers and manufacturers register and pay taxes annually fit neatly into that category of 'presumptively lawful measures.'" *United States v. Cox,* 906 F.3d 1170, 1187 (10th Cir. 2018) (quoting *Heller*); *see also Andoe v. Trump,* 2018 U.S. Dist. LEXIS 248015, **3-4 (D. Idaho Nov. 30, 2018) (NFA falls within commercial sale of firearms exception identified in *Heller*). This type of registration requirement is consistent with Supreme Court and Seventh Circuit precedent and does not violate the Second Amendment. *Justice v. Town of Cicero,* 577 F.3d 768, 774-75 (7th Cir. 2009) (finding that town ordinance requiring registration of firearm is consistent with *Heller*). This remains equally true after *Bruen. United States v. Royce,* 2023 WL 2163677, *3 (D.N.D. Feb. 22, 2023) (finding regulations under NFA "seem to be the same sort of regulatory measure of which *Heller* approved").

Moreover, "the Second Amendment's text doesn't protect keeping and bearing any weapon in every way possible." *United States v. Reyna,* 2022 WL

17714376 at \*3 (N.D. Ind. 2022), citing *Heller*, 554 U.S. at 626-27. "A weapon generally is covered if a person can carry it, . . . but not if the weapon is uncommon or unusually dangerous or not typically used by law-abiding people for lawful purposes." *Reyna*, 2022 WL 17714376 at \*3 (citations omitted). In *Reyna*, this Court indicated that determining whether the Second Amendment's plain text covers the statutorily regulated conduct requires first asking whether the statute regulates "mere 'possession of a firearm'" or possession of a specific type of firearm. *Id.*

Here, Defendant is charged with violating a specific provision of the NFA. The NFA regulates certain types of "firearms" and establishes criminal offenses for violations of those regulations. These "firearms" do not include basic handguns, revolvers, or long guns, but rather include weapons such as short-barreled shotguns, machineguns, silencers, and destructive devices. 26 U.S.C. § 5845(a). The NFA regulates highly dangerous offensive weapons because of their capacity for destruction. *See United States v. Freed*, 401 U.S. 601, 609 (1971) (describing the hand grenades at issue in a 26 U.S.C. § 5861(d) prosecution as "highly dangerous offensive weapons").

The criminal statute with which Defendant is charged, 26 U.S.C. § 5861(d), does not regulate mere possession of a wide range of firearms. It instead regulates the possession or receipt of highly dangerous offensive "firearms" without proper registration in the National Firearms Registration

11

and Transfer Record. The Court must determine whether that conduct is covered by the plain text of the Second Amendment. It is not.

*Heller* and *Bruen* emphasized the exclusion from the Second Amendment of "weapons not typically possessed by law-abiding citizens for lawful purposes, such as short-barreled shotguns." *Heller*, 554 U.S. at 625; *see Bruen*, 142 S.Ct. at 2156 (striking down New York's regulation because it prevented "law-abiding citizens with ordinary self-defense needs from exercising their right to keep and bear arms"). NFA prohibited "firearms" are not typically possessed by law-abiding citizens for lawful purposes.

The "NFA's object was to regulate certain weapons likely to be used for criminal purposes." *United States v. Thompson/Center Arms Co.*, 504 U.S. 505, 516-17 (1992), citing H.R. Rep. No. 1337, 83d Cong., 2d Sess., A395 (1954) (discussing "the clearly indicated congressional intent to cover under the National Firearms Act only such modern and lethal weapons, except pistols and revolvers, as could be used readily and efficiently by criminals or gangsters"). "[R]egulating the receipt or possession of 'dangerous and unusual firearms' like short-barreled rifles does not fall within the Second Amendment." *United States v. Rush*, 2023 WL 403774 at *3 (S.D. Ill. Jan. 25, 2023) (denying defendant's motion to dismiss a 26 U.S.C. § 5861(d) indictment based on *Bruen*); *see also United States v. Holton*, 2022 WL 16701935 at *3 (N.D. Tex. 2022) ("§ 5861(d) and § 5861(h) do not prohibit conduct protected by the Second Amendment");

*United States v. Hoover*, 2022 WL 10524008 (M.D. Fla. 2022) (denying defendant's motion to dismiss indictment charging possession of unregistered machinegun).

In *Reyna*, this Court expressed that prohibiting "possession or use of a particular type of gun might bring a regulation within the Second Amendment's scope if the class of firearms is defined by its functionality." *Reyna*, 2022 WL 17714376 at *5. But the NFA, and particularly 26 U.S.C. § 5861(d), does not prohibit certain classes of firearms. Instead, it requires possessors of these classes of firearms to register them in the National Firearms Registration and Transfer Record. Unlike in *Reyna*, § 5861(d) does not even reduce the pool of guns available to Defendant for self-defense. *Id.* It only imposes registration requirements for these "weapons likely to be used for criminal purposes." *Thompson/Center Arms Co.*, 504 U.S. at 516-17.

The Second Amendment's plain text does not cover the conduct regulated by 26 U.S.C. § 5861(d). NFA "firearms" are highly dangerous offensive weapons not "typically possessed by law-abiding citizens for lawful purposes." *Heller*, 554 U.S. at 624.

Applied to the facts here, Defendant is charged with possessing an unregistered slam-fire gun, which could be concealed on his person but still discharge a shot through explosives. Other slam-fire guns were "destructive devices" that had large barrels and were unsuitable for sporting purposes.

13

These devices are not the type of weapon "typically possessed by law-abiding citizens for lawful purposes," and therefore do not fall within the ambit of Second Amendment. *Heller*, 554 U.S. at 624; *see also United States v. Tagg*, 572 F.3d 1320, 1326-27 (11th Cir. 2009) (finding and collecting cases that possession of pipe bombs, machine gun, sawed-off shotgun and "destructive devices" is not protected by the Second Amendment); *Royce*, 2023 WL 2163677, *3-4 (NFA's regulation of short-barrel rifle and silencer permissible post-*Bruen*). The Court should deny Defendant's motion under *Bruen*'s first prong.

### 3. The provisions of the NFA coincide with historically-imposed firearm regulations

Even if Defendant's conduct was covered by the text of the Second Amendment, his challenge still fails. The NFA's regulations pertaining to "firearms" are in line with two historical traditions in this country: first, the historical tradition of regulating "dangerous and unusual firearms," and second, the historical tradition of regulating commerce in firearms.

Defendant characterizes the NFA as prohibiting unregistered possession of homemade firearms. DE 36 at 13-14. But the NFA is a comprehensive taxing scheme targeted not at homemade firearms but rather "weapons likely to be used for criminal purposes." *Thompson/Center Arms Co.*, 504 U.S. at 516-17. "Firearms" under the NFA include "destructive devices" and "any other weapon, as defined above." 26 U.S.C. §§ 5845(e), (f).

To assess "whether modern firearms regulations are consistent with the Second Amendment's text and historical understanding," *Bruen* contemplated two avenues of inquiry: (1) a "straightforward historical inquiry" to search for historical regulations similar to the modern-day regulatory counterpart at issue or evidence that a comparable historical regulation was rejected on constitutional grounds; or (2) a "historical analogy" for instances where there is no such straightforward correspondence between the challenged law and predecessors. *Bruen*, 142 S. Ct. at 2131-34.

For Defendant's challenge to § 5861(d), the "straightforward historical inquiry" suffices. *Heller* explained—and *Bruen* did not disturb—that this nation's "historical tradition" includes "prohibiting the carrying of dangerous and unusual weapons." *Heller*, 554 U.S. at 637. For example, under English common law, "the offense of riding or going armed, with dangerous or usual weapons, [was] a crime." 4 W. Blackstone, Commentaries on the Laws of England 148–49 (1769). In the United States, too, courts have long acknowledged that a man commits "an offence at common law" when he "arms himself with dangerous and unusual weapons, in such a manner as will naturally cause a terror to the people." *State v. Langford*, 3 Hawks 381, 383 (NC 1824). For that reason, the Second Amendment encompasses only arms "'of the kind in common use at the time.'" *Heller*, 554 U.S. at 624, quoting *Miller*, 307 U.S. at 179.

*Bruen* referred to *Heller's* finding that from "'Blackstone through the 19th-century cases, commentators and courts routinely explained that the [Second Amendment] right was not a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose.'" *Bruen*, 142 S.Ct. at 2128, quoting *Heller*, 554 U.S. at 626. The "'historical tradition of prohibiting the carrying of dangerous and unusual weapons'" supported the conclusion "that the Second Amendment protects the possession and use of weapons that are 'in common use at the time.'" *Bruen*, 142 S.Ct. at 2128, quoting *Heller*, 554 U.S. at 627 and *Miller*, 307 U.S. at 179 (further quotations omitted). *Bruen* re-emphasized *Heller's* recognition of the historical tradition of regulating "dangerous or unusual weapons." *See Bruen*, 142 S. Ct. at 2143-44.

In addition to the historical tradition of regulating "dangerous and unusual firearms," there is also a historical tradition of regulating commerce surrounding firearms and requiring registration. "[C]olonial governments substantially controlled the firearms trade." *Teixeira v. Cnty. of Alameda*, 873 F.3d 670, 685 (9th Cir. 2017). For example, "a 1652 New York law outlawed illegal trading of guns, gun powder, and lead by private individuals." Robert J. Spitzer, *Gun Law History in the United States and Second Amendment Rights*, 80 Law & Contemp. Probs. 55, 76 (2017). "A 1631 Virginia law required the recording not only of all new arrivals to the colony, but also 'of arms and munitions.'" *Id.* In the early 17th century, Connecticut banned residents from

16

selling firearms outside the colony. *Teixeira*, 873 F.3d at 685. Virginia provided that people were at "liberty to sell armes and ammunition to any of his majesties loyall subjects inhabiting this colony." *Id.* at 685 n.18. And other colonial governments "controlled the conditions of trade" in firearms. *Id.* at 685.

States continued to enact laws governing "the manufacture, sale, [and] transport" of guns and ammunition in the 18th and 19th centuries. *Gun Law History*, 80 Law & Contemp. Probs. At 74. For example, in 1814, "Massachusetts required that all musket and pistol barrels manufactured in the state be first tested," and it appointed a state inspector "to oversee or conduct the testing." *Id.* Likewise, in 1820, "New Hampshire created and appointed state gunpowder inspectors to examine every storage and manufacturing site." *Id.* Meanwhile, "[t]wentieth century laws extended safety regulations pertaining to gunpowder and other explosives." *Id.*

Like these early laws, the NFA's registration and taxation requirements for "destructive devices" and "any other weapon" do not prohibit possessing or even transferring these firearms. Instead, the statute at issue merely imposes record-keeping and attendant payment requirements to document the firearms. The practice of the colonies and the United States or regulating commerce in firearms provides a sufficient historical analogue to the NFA.

## C. Conclusion

The conduct regulated by 26 U.S.C. § 5861(d) is outside the scope of the Second Amendment. Moreover, laws have long regulated the possession of "dangerous and unusual firearms" like those in the NFA. Defendant's motion to dismiss the indictment should be denied.

Dated: February 24, 2023

Respectfully submitted,

CLIFFORD D. JOHNSON
UNITED STATES ATTORNEY


BY:    /s/Jerome W. McKeever
Jerome W. McKeever
Assistant United States Attorney
M01 Robert A. Grant Federal Bldg.
204 S. Main Street
South Bend, Indiana  46601
Tel:   (574) 236-8287
E-mail:  Jerome.McKeever@usdoj.gov

*s/ Molly E. Donnelly*
Molly E. Donnelly
Assistant United States Attorney
Email: Molly.Donnelly@usdoj.gov

*s/ Nathaniel L. Whalen*
Nathaniel L. Whalen
Assistant United States Attorney
Email: Nathaniel.Whalen@usdoj.gov